1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| TIMOTHY W. MOORE, | ) | 1:05-cv-00775 AWI JMD |
| | ) | |
| | ) | |
| Plaintiff, | ) | FINDINGS AND RECOMMENDATION REGARDING PLAINTIFF'S SOCIAL SECURITY COMPLAINT |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner of Social Security, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## BACKGROUND

Plaintiff Timothy W. Moore ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for disability insurance benefits and supplemental security income ("SSI") pursuant to Titles II and XVI of the Social Security Act. The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable John M. Dixon, Jr., United States Magistrate Judge, for findings and recommendation to the District Court.

## FACTS AND PRIOR PROCEEDINGS[1]

On April 23, 2003, Plaintiff filed an application for SSI and disability insurance benefits. AR 53-55. He alleged disability since July 5, 2000, due to lumbar disc syndrome, lumbosacral

---

[1] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

radiculitis and right leg and right shoulder issues.  AR 64-65.  After being denied both initially

and upon reconsideration, Plaintiff requested a hearing before an Administrative Law Judge

("ALJ").  AR 35-38, 41-45, 46-47.  On October 20, 2004, ALJ James P. Berry held a hearing.

AR 216-245.  ALJ Berry denied benefits on November 17, 2004.  AR 10-20.  On April 13, 2005,

the Appeals Council denied Plaintiff's request for review.  AR 4-6.

     <u>Hearing Testimony</u>

     The hearing convened in Fresno, California.  AR 216.  Plaintiff appeared with his

attorney, Dennis Bromberg.  AR 218.  Vocational expert ("VE") Judith Najarian also appeared

and testified.  AR 218, 239-243.

     Plaintiff testified that he was born on July 13, 1959.  AR 219.  He is 5'8" and weighs 205.

AR 219.  He is right handed.  AR 219-220.  He finished the tenth grade, but he cannot read or

write.  AR 220.  After leaving school, he did not get vocational training.  AR 220.

     Plaintiff reported that he was a self-employed machine operator on heavy equipment for

quite a few years.  AR 220.  As a heavy equipment operator, he put in leach lines in the Sierra

Nevadas for over 23 years, along with septic tanks, house pads and driveways.  AR 221.  He also

dug PG&E lines and worked with the telephone company.  AR 221.  He did "[p]retty much

everything in the Sierra Nevadas that takes equipment."  AR 221.  In that type of work, he would

have to do lifting, carrying and bending.  AR 221.  He put 32 tons of rock into a 100 foot leach

line that was two feet wide.  AR 221.  He would move it with a shovel so the four-inch pipe

could go into it.  AR 221.  The heaviest that he had to lift and carry by himself was a one foot

backhoe bucket or a front tire to the backhoe.  AR 221.  They would weigh "150 pounds or

better."  AR 221.  He did that work until about '95 and then did some maintenance work.  AR

221.

     Plaintiff testified that he did the maintenance job in '97.  AR 221.  He was the

"maintenance of the town of Prather, California, the whole town."  AR 221.  He worked taking

care of the sewage plant and taking care of electrical, plumbing, asphalt and roofing problems for

the town of Prather.  AR 222.  He stopped doing that job in 2000 because he got hurt.   AR 222.

He "blew out" his back.  AR 222.

Plaintiff continues to have back problems.  AR 222.  He has pain in the back, which is located in the center and on the right side of his lower back at the beltline.  AR 222.  It goes down his right leg and in his right groin.  AR 222.  The pain that goes down the right leg is light, but gets worse when he turns wrong.  AR 222.  The groin pain is "a mellow burn."  AR 223.  On a good day, the back pain is just a constant pain.  AR 223.  Between a one and a ten, he would say it is a three.  AR 223.  On a bad day, it is about eight or nine.  AR 223.  In a typical week, he has about three or four good days and then the rest he is down.  AR 223.  About half the time, he has good days.  AR 223.  When he is down, he is "not doing nothing but getting up and going to the bathroom."  AR 223.  He is not moving around at all.  He is not driving or cooking or anything.  AR 223.

Plaintiff testified that bending and lifting heavy bags of groceries make the back pain worse.  AR 224.  It is worse in winter.  AR 224.  He keeps a heating pad on during the wintertime.  AR 224.  It helps.  AR 224.  His medicines and the back exercises that the doctors gave him to do help with the pain.  AR 224.  He has headaches as a side effect from the medications.  AR 224.  They are occasional and depend on how much he hurts and then how much medicine he takes.  AR 224.

Plaintiff testified that the pain that goes down the right leg goes to about the middle of the back of his calf.  AR 224.  It "hurts mostly between--around the back of the knee."  AR 224.

Plaintiff brought a cane to the hearing.  AR 225.  He testified that the doctor prescribed it for him and Workmen's Comp helped him get it.  AR 225.  He got it a couple of months after he got hurt.  AR 225.  He was on crutches until that time and a walker.  AR 225.  He has had the cane ever since he was off the crutches.  AR 225.  He uses it every day.  AR 225.  He uses the cane around the house on bad days, but not on good days.  AR 225.  He tries to go out of the house to do activities without the cane.  AR 225.  He takes the cane with him to the store in the car and uses it on his way out.  AR 225.  He sometimes goes in the store without the cane, but uses the basket with wheels on it to get around.  AR 225.

Plaintiff testified that he has a back brace.  AR 225.  He wears it about four or five times a week when the pain gets worse and when he knows he is going to sit--like at the hearing.  AR

3

226. Sitting is his main problem. AR 226. He can sit maybe 20 or 30 minutes before he needs to get up and get out of the chair. AR 226. He did not know. AR 226. He does not sit any more. AR 226. He walks two-and-a half blocks to the grocery store and back, which is about five blocks. AR 226. He rests when he gets there before he does shopping. AR 226-227. He actually does not go to get groceries. AR 227. He is trying to exercise. AR 227. When he gets to the store, he leans against a basket and there is a place to sit down. AR 227. Then he walks back two-and-a-half blocks. AR 227.

Plaintiff testified that he stands about ten to twenty minutes a day depending on dishes and vacuuming. AR 227. Plaintiff thought he could be on his feet for maybe three to four hours in an eight-hour workday. AR 227. He does not sit. AR 227. He stands or lies down and that "takes off the pain." AR 227-228. Sitting makes his back bend and he can feel the fluids leaking and running down the back of his leg. AR 228. He did not think he could sit for two hours out of an eight-hour workday. AR 228.

Plaintiff testified that his doctors mentioned the possibility of surgery. AR 229. They have not recommended it yet. AR 229.

Plaintiff testified that on bad days he is lying down completely, which is about three or four days a week. AR 229. He also has had some upper right shoulder problems. AR 229. It comes and goes, hurting once in maybe two/three times a year. AR 229. His back and his leg are his "number one that hurt." AR 229. He gets "a numbness" in his right hand because he has a knot. AR 229-230. He is having numbness in his right hand "lately quite a bit." AR 230. In the last 12 months, he has had it about eight to ten times. AR 230. It is a heavy tingling. AR 230. It lasts about ten to fifteen minutes. AR 230.

Plaintiff testified that the heaviest thing he can lift is some groceries. AR 230. He thinks they weigh "between seven and 12 pounds of bags." AR 230. His son does most of the grocery shopping. AR 230. He can lift 12 pounds with his left hand because he has his cane in the right one. AR 230. He is carrying everything with his left now. AR 230.

Plaintiff testified that on his good days, he goes out and gets the mail, which is about 50 yards. AR 230-231. He takes the dog for a walk to the end of the block, which is "about 150

4

1  yards and back." AR 231.  He does cooking for himself and his son.  AR 231.  He washes

2  dishes.  AR 231.  He does not mop the floor any more.  AR 231.  He vacuums.  AR 231.  The

3  longest he can do any of those chores without resting is 45 minutes.  AR 231.  He spends "about

4  an hour-and-a-half/two hours" doing chores on good days.  AR 231.

5  Plaintiff testified that the pain affects his ability to concentrate or pay attention once in a

6  while.  AR 231.  He always has had a problem paying attention.  AR 231.  He does not read or

7  write, "so paying attention is kind of hard for [him] other than working with equipment."  AR

8  231.  He is okay staying on task for 45 minutes doing his cooking or other chores.  AR 232.  He

9  would have to lie down in between whatever the chore is for two hours.  AR 232.  He can focus

10  for 45 minutes or an hour.  AR 232.  He does not stand and cook for long periods of time.  AR

11  232.

12  In response to questions from the ALJ, Plaintiff testified that he is not married.  AR 232.

13  His son is 22.  AR 232-233.  Plaintiff received money from his Workers' Comp injury.  AR 232.

14  He guessed that he got $47,000.  AR 232.  The money ran out in 2002.  AR 233.  The money

15  started in 2000 after he got hurt and then it ended last June.  AR 233.  He got a lump sum

16  payment at the end.  AR 233.  He believed he "got 4,000 something."  AR 233.  During that

17  period, he did not take or receive vocational training.  AR 233-234.  He was not trained for

18  another job.  AR 234.  He did not get money in lieu of getting vocational training.  AR 234.  All

19  he got was Workmen's Comp.  AR 234.

20  In the maintenance that he performed, Plaintiff was taking care of the sewage ponds for

21  the town of Prather, which included everything from running equipment, cleaning them out,

22  removing the dirt, weed eating around all the ponds, maintaining the sludge pumps, asphalting

23  the asphalt out on the parking lot when it would get a bad crack, electrical and "pretty much

24  everything a whole town needs done."  AR 234-235.  He had to replace pumps.  AR 235.  He did

25  not have to replace fuse boxes.  AR 235.  He had electricians there.  AR 235.  He had the

26  electricians do the big electrical problems.  AR 235.  He had to keep weeds away from the ponds

27  and apply chemicals and herbicides.  AR 235.  He also worked with the Water Control Board of

28

1  Sacramento on keeping the pHs and DOs down.  AR 235.  He did chlorine tests and had to keep
2  a log.  AR 235.

3       Plaintiff testified that he took some pain medication the morning of the hearing.  AR 236.
4  He cannot pronounce the names of the medications.  AR 235.  He takes more than one.  AR 236.
5  The pain medications help.  AR 236.  One side effect from the medications is headache.  AR 236.
6  After a while, he sees little spots floating around.  AR 236.

7       Plaintiff testified that he has a driver's license and he drove to the hearing.  AR 236.  He
8  is able to lift and carry approximately 12 pounds using one hand.  AR 236-237.  That is about
9  what he carries in groceries with the soups.  AR 237.  He could sit less than an hour total over an
10  eight-hour period.  AR 237.

11       Plaintiff testified that he applied for GR to support himself.  AR 237.  He just got GR a
12  week or two ago.  AR 237-238.  He gets food stamps.  AR 238.  He does not get a rent subsidy or
13  section eight.  AR 238.  All he gets is GR and food stamps.  AR 238.  He has his son paying for
14  the other half of the apartment and the bills.  AR 238.

15       Plaintiff's counsel reported that Plaintiff was taking generic medications for soma and
16  Vicodin.  AR 238-239.

17       VE Judith Najarian also testified at the hearing.  AR 239.  The VE had an opportunity to
18  listen to Plaintiff's testimony concerning his past work and to review the work-related
19  background material.  AR 239.  Plaintiff provided information to the VE regarding his
20  maintenance job.  AR 240.  In addition to the ponds, he would replace lights, work on carpet and
21  baseboards, design out walls, repair and replace toilets, clear and replace sinks and fix light
22  sockets.  AR 240.

23       The VE testified that Plaintiff's past relevant work as a sewage plant attendant was
24  medium and semi-skilled in the DOT.  AR 240.  His building maintenance work was medium
25  and skilled in the DOT.  AR 240-241.  The equipment operation and heavy equipment operator
26  work was in the DOT as medium and skilled.  AR 241.  Based on Plaintiff's testimony and the
27  exhibits, Plaintiff would lift up to 150 pounds on occasion, which the VE testified would put it in
28

1  the very heavy category. AR 241. In the exhibit the VE reviewed, Plaintiff showed that he

2  would lift up to 75 pounds in maintenance, which would put it in the heavy category. AR 241.

3      For the first hypothetical, the ALJ asked the VE to consider an individual who was 45

4  years of age with a tenth grade education and Plaintiff's past work experience. AR 241. This

5  individual had a combination of severe impairments and retained the residual functional capacity

6  to lift and carry 20 pounds occasionally, 10 pounds frequently. AR 241. This individual also

7  retained the ability to stand, walk and sit for six hours each and occasionally climb, stoop, kneel,

8  crouch and crawl. AR 241. The VE testified that such an individual could not perform any of

9  the claimant's past work. AR 241. This individual could perform other jobs in the national

10  economy in the unskilled light category with a reduction for those jobs that would require more

11  frequent stooping, kneeling or crouching. AR 241. The VE testified that an example of a light,

12  unskilled job would be a vending machine attendant, with 16,839 jobs in California and about ten

13  times that for the United States. AR 242. The VE testified that another example would be light

14  delivery, with 20,205 jobs in California and about ten times that in the United States. AR 242.

15  Another example would be light production work, with 32,785 jobs in California and about ten

16  times that for the United States. AR 242.

17      For the second hypothetical, the ALJ asked the VE to consider a person with the same

18  vocational parameters listed in the previous hypothetical. AR 242. This individual also had a

19  combination of severe impairments and retained the residual functional capacity to lift and carry

20  12 pounds maximum occasionally and less than 12 pounds frequently. AR 242. This individual

21  also retained the ability to stand three to four hours maximum and to sit 20 minutes total. AR

22  242. This individual would have difficulty bending and stooping and would need to walk with

23  the assistance of a cane. AR 242. The VE testified that this individual could not perform any of

24  Plaintiff's past work and could not perform any other jobs that existed in the national economy.

25  AR 242.

26      For the third hypothetical, Plaintiff's legal counsel asked the VE to assume the same

27  parameters as the Plaintiff. AR 243. Plaintiff's legal counsel also asked the VE to assume the

28  person could lift 40 pounds occasionally and 20 pounds frequently, would be unable to do work

1   requiring repeated bending or heavy lifting, could sit one hour out of an eight-hour workday,

2   could stand and walk one mile with a cane with intermittent resting periods, could not kneel,

3   squat or climb stairs except on an infrequent basis, could do work below the shoulder level

4   occasionally and above the shoulder level on the right, could not work with the right hand

5   overhead and could lift 20 pounds maximum with the right hand.  AR 243.  The VE testified that

6   this person would not be able to do any of Plaintiff's past relevant work or any other work.  AR

7   243.

8        Medical Evidence

9        On July 5, 2000, Plaintiff sought emergency treatment at Clovis Community Hospital for

10  complaints of low back pain.  AR 82.  Plaintiff was injured on the job site.  AR 82.  A workers'

11  compensation physician completed a Workers Compensation Evaluation form.  AR 83.  On

12  examination, Plaintiff complained he hurt his back again.  AR 83.  He had mid-low back pain,

13  which was sharp and increased with walking and movement.  AR 83.  There were no x-ray or

14  laboratory findings.  AR 83.  He was prescribed Lortab and ibuprofen and was discharged with a

15  working diagnosis of acute low back pain and chronic back pain.  AR 83.

16       On July 5 and 6, 2000, Gloria Brough-Stevenson, M.D., completed two Doctor's First

17  Report of Occupational Injury or Illness forms regarding her examination and treatment of

18  Plaintiff on July 5, 2000.  AR 84, 154.  Plaintiff complained to her of sharp, mid-low back pain,

19  which increased with walking and movement.  AR 84, 154.  Dr. Brough-Stevenson diagnosed

20  Plaintiff with chronic back pain and acute low back strain.  AR 84, 154.  Plaintiff was provided

21  medications.  AR 84, 154.  Dr. Brough-Stevenson opined that Plaintiff could return to modified

22  work on July 12, 2000.  AR 84, 154.

23       On July 18, 2000, chiropractor John Diaso, D.C., completed a Doctor's First Report of

24  Occupational Injury or Illness form regarding examination of Plaintiff.  AR 153.  Plaintiff

25  complained of lower back pain, light leg tingling and right shoulder pain.  AR 153.  Dr. Diaso

26  diagnosed lumbar sprain/strain and radiculitis.  AR 153.  Dr. Diaso opined that Plaintiff was able

27  to perform his usual work and could return to modified work on July 29, 2000, with a restriction

28  on heavy lifting.  AR 153.

On August 22, 2000, Dr. Diaso prepared a Primary Treating Physician's Progress Report for the State Division of Workers' Compensation ("Progress Report") regarding examination of Plaintiff on August 16, 2000. AR 149.  Plaintiff complained of constant, slight to moderate pain in the right low back to the knee, which was worse with prolonged sitting and standing.  AR 149. Dr. Diaso diagnosed Plaintiff with a disc lesion and lumbar sprain/strain.  AR 149.  Plaintiff was instructed to remain off-work until his MRI.  AR 149.

On August 22, 2000, Plaintiff underwent an MRI of the lumbar spine.  AR 150-151. Based on the MRI, radiologist William F. Partlow, M.D., opined that Plaintiff had mild degenerative disc change and a slight posterior disc bulge at the L1-2 level, disc dehydration associated with a mild posterior disc bulge at the L4-5 level, an annular fissure in the central third of the disc bulge at the L4-5 level, moderate degenerative collapse of the disc space at the L5-S1 level and a mild broad-based central disc protrusion that touched, but did not deform, the anterior medial margins of the descending right and left S1 nerve roots.  AR 151.  An orbital screening done that same date showed no evidence of a metallic foreign body.  AR 152.

On October 16, 2000, Michael Brown, P.A.-C, D.C., F.A.C.O., of Spine & Orthopedic Medicine Associates saw Plaintiff for a consultation and prepared summary correspondence to the State Compensation Insurance Fund.  AR 96-100.  David Salinger, M.D., also signed the correspondence.  AR 100.  Plaintiff reported that in the process of moving a thirty-foot tank, he was shoveling dirt underneath the tank to keep it from rolling when he felt an acute onset of severe lower back pain with peripheral leg pain and numbness.  AR 96.  He had to sit down because he could not feel his legs.  AR 96.  He was taken to the hospital by ambulance and given some medications.  AR 96.  After the incident, Plaintiff began to see Dr. Diaso and started a course of chiropractic treatment.  AR 97.  Plaintiff reported that his pain had improved to about a 4 or 5/10 on a 0 to 10 pain scale.  AR 97.  On physical examination, Plaintiff did not have signs of dural tension in a supine and sitting straight leg raise.  AR 98.  He had pain and limits on lumbar flexion.  AR 98.  Standing lumbar extension elicited increasing back pain.  AR 98.  Prone lumbar extension increased his back pain and caused pain that extended into the groin.  AR 98.

PA Brown indicated that an MRI demonstrated a "dessicated disc in the upper lumbar spine" and a "degenerative collapse with a loss of approximately 50% of the disc space at L5-S1." AR 98. Plaintiff had "disc dessication at L4-L5 with a hyperintense signal at the posterior annulus, which [was] rather large corresponding to an annular fissure." AR 98. He had a small bulge at that disc level. AR 98. PA Brown assessed Plaintiff with preexisting history of degenerative disc disease at two levels with degenerative collapse at the L5-S1, history of hyperintense zone on MRI suggesting an annular fissure and aggravation of "underlining degenerative disc disease and possible internal disruption at L4-L5 causing mechanical low back pain and chemical radiculitis or peripheral referred leg pain." AR 99. Plaintiff was to begin four to six weeks of aggressive spine stabilization exercise. AR 99.

On October 9, 2000, Dr. Diaso completed a Progress Report regarding examination of Plaintiff on October 6, 2000. AR 148. Plaintiff complained of intermittent, slight to moderate, right-sided low back and leg pain. AR 148. Dr. Diaso diagnosed Plaintiff with "lumbar HNP" and sciatica. He instructed Plaintiff to remain off-work until October 20, 2000. AR 148. Dr. Diaso also instructed Plaintiff to return to modified work on October 20, 2000, with the limitations or restrictions of no heavy lifting and limited bending and twisting at the trunk. AR 148.

On November 21, 2000, Dr. Diaso completed a Treating Physician's Report of Disability Status form for the State Compensation Insurance Fund. AR 147. Dr. Diaso expected to release Plaintiff to return to his pre-injury occupation on or about November 21, 2000. AR 147. Dr. Diaso opined that Plaintiff was "currently physically able to participate in vocational rehabilitation services." AR 147.

On November 27, 2000, Dr. Diaso completed a Progress Report form regarding examination of Plaintiff. AR 146. Plaintiff complained of severe lower back pain and right leg pain, which traveled into the calf. AR 146. Plaintiff reported suffering a flare-up when he bent over to pick up a piece of wood. AR 146. Dr. Diaso diagnosed Plaintiff with "Lumbar HNP" and instructed him to remain off-work until December 27, 2000. AR 146. His treatment plan

included manipulation, traction, ice and EMS 3x per week until pre-flare.  AR 146.  Plaintiff also
was referred out for pain medication.  AR 146.

On January 10, 2001, Dr. Diaso completed a Progress Report regarding examination of
Plaintiff on January 8, 2001.  AR 144.  Plaintiff complained of trouble sleeping and of pain that
traveled into the groin, which was described as frequent, slight to moderate pain.  AR 144.  Dr.
Diaso diagnosed Plaintiff with lumbar disc herniation and reportedly requested a diagnostic
discogram to determine the location of disc (annular) tear.  AR 144.  Dr. Diaso instructed
Plaintiff to remain off-work until April 2001.  AR 144.

On January 16, 2001, Dr. Diaso prepared a Treating Physician's Report of Disability
Status form for the State Compensation Insurance Fund.  AR 145.  Dr. Diaso opined that
Plaintiff's permanent disability as a result of the injury (whether or not combined with the effects
of a prior injury or disability, if any) was likely to preclude him from returning to work at his pre-
injury occupation.  AR 145.  Plaintiff was not "currently physically able to participate in
vocational rehabilitation services."  AR 145.  Dr. Diaso estimated that participation may be
possible as of February 15, 2001.  AR 145.

On February 27, 2001, Dr. Diaso completed a Progress Report regarding examination of
Plaintiff on February 26, 2001.  AR 143.  Plaintiff complained of right low back pain that
traveled into the right groin.  AR 143.  Dr. Diaso diagnosed Plaintiff  with lumbar disc syndrome
and disc degeneration.  AR 143.

On March 1, 2001, PA Brown saw Plaintiff for a follow-up visit and sent a corresponding
letter to the State Compensation Insurance Fund.  AR 93-95.  M. Makoto Iwamoto, M.D., also
signed the letter.  AR 95.  PA Brown indicated that Plaintiff experienced flares with increased
pain that radiated into his left lower extremity.  AR 93.  Plaintiff predominately had central lower
back pain with pain radiating into the right leg that switched and radiated into his left leg.  AR
93.  The pain became severe and Plaintiff was provided with a Medrol Dose Pak, an oral steroid,
which reduced the left leg pain.  AR 93.  PA Brown indicated that although they had "assisted
[Plaintiff] in relieving his acute peripheral left leg pain, he [was] going to return right back to the
same chronic low back pain state."  AR 93.  PA Brown did not believe that proliferant injections

would be of significant assistance "since [Plaintiff's] pain [was] predominately discogenic in nature." AR 94. PA Brown did not believe Plaintiff was a candidate for successful vocational rehabilitation or a lumbar fusion. AR 93. PA Brown opined that most pain interventionists would probably start on a course of selective corticosteroid injections and a series of epidural blocks. AR 95. PA Brown did not believe that those procedures would be of "any significant benefit" to Plaintiff because he "would have possibly several days of some improvement followed by a return of the symptomatic complaint back to its baseline level and [would] continue in chronicity." AR 95.

On May 23, 2001, Dr. Diaso completed a Progress Report form regarding examination of Plaintiff on May 21, 2001. AR 142. Plaintiff complained of frequent, minimal low back pain, which was described as a dull ache. AR 142. With heavy work, his low back pain and leg pain became greater than moderate. AR 142. Dr. Diaso diagnosed Plaintiff with lumbar disc syndrome and disc degeneration. AR 142. Plaintiff's treatment plan included manipulation, traction, ES and heat as needed. AR 142.

On June 15, 2001, Dr. Diaso saw Plaintiff and wrote to the State Compensation Fund regarding the visit. AR 139-141. Plaintiff complained of exacerbation to his low back and right leg after cutting grass and performing other duties for about six hours on the ranch where he lived. AR 139. Plaintiff reported calling Michael Brown and being prescribed Codeine as needed. AR 139. On examination, Plaintiff tested SLR positive on the right for right leg pain. AR 140. Dr. Diaso diagnosed lumbar disc syndrome and disc degeneration. AR 140. Dr. Diaso opined that Plaintiff continued to suffer from an unstable lumbar disc injury and his back pain would not stabilize without some type of surgical intervention. AR 140. Dr. Diaso further opined that Plaintiff continued to be at a "temporary total disabled" status. AR 140.

On July 7, 2001, Dr. Diaso completed a Progress Report form regarding examination of Plaintiff on July 6, 2001. AR 138. Plaintiff complained that he twisted and developed sudden, sharp, right-sided low back pain, which traveled into the groin and was described as constant greater than moderate. AR 138. Dr. Diaso diagnosed Plaintiff with lumbar disc lesion and "lumbar Disc beg." AR 138. Plaintiff's treatment plan included traction, manipulation, ice and

1   EMS.  AR 138.  Dr. Diaso instructed Plaintiff to remain off-work until August 30, 2001.  AR
2   138.

3        On July 10, 2001, PA Brown sent a letter to the State Compensation Insurance Fund
4   regarding a follow-up visit by Plaintiff on that same date.  AR 90-92.  David Salinger, M.D., also
5   signed the letter.  AR 92.  Plaintiff reported an acute onset of severe low back pain after he put a
6   bowl of dog food down and he stood back up.  AR 90.  He complained of rather severe pain
7   across the lumbosacral spine periodically extending down to the buttock.  AR 90.  Plaintiff also
8   descried intense pain over the right groin area.  AR 90.  On examination, Plaintiff had tenderness
9   across the lumbosacral region.  AR 91.  Repeated extension movements relieved his lower back
10  pain, but increased his groin pain.  AR 91.  PA Brown assessed Plaintiff with possible
11  ilioinguinal hernia (non-industrial related) and aggravation of discogenic low back pain
12  (industrial related).  AR 91.  Plaintiff was put on a McKenzie exercise program and provided
13  Zanaflex, a Medrol Dose Pak, Celebrex and continued Codeine.  AR 91.

14       On September 19, 2001, Dr. Diaso completed a State Compensation Insurance Fund form
15  and opined that Plaintiff would be able to return to work on November 15, 2001.  AR 89.

16       On September 28, 2001, PA Brown completed a Physician's Permanent and Stationary
17  Report for the State Compensation Insurance Fund.  AR 85-88.  PA Brown indicated that
18  Plaintiff was in for follow-up and he had last seen Plaintiff on July 10, 2001.  AR 85.  At that
19  time, PA Brown put Plaintiff on a specific exercise protocol and some McKenzie exercises.  AR
20  85.  Plaintiff reported that within three to seven days of starting the exercises his back began to
21  improve and he hardly had any back pain at all.  AR 85.  If he tried to carry two bags of groceries
22  that were heavy, he would start to experience increasing back pain by the time he got to his
23  house.  AR 85.  Plaintiff also experienced increased pain periodically with stooping and bending.
24  AR 85.  PA Brown felt that Plaintiff had reached the point of maximum medical improvement
25  from his condition unless interventional procedures were done.  AR 85.

26       PA Brown assessed Plaintiff with internal disc derangement/disruption causing a number
27  of months of chronic lower back difficulties, improved with McKenzie exercise protocols.  AR
28  86.  Plaintiff also had some residual internal disc disruption that would become symptomatic

with certain movements.  AR 86.  PA Brown opined that Plaintiff was permanent and stationary.
AR 86.  He had slight to moderate low back pain with repeated very heavy lifting and repeated
stooping and bending.  AR 87.  PA Brown indicated that Plaintiff had moderate degenerative disc
disease at L5-S1 with early degenerative changes at L4-5 with a high intensity zone of the
posterior annulus consistent with an annular fissure.  AR 87.  Plaintiff was restricted from heavy
lifting.  AR 87.  PA Brown further opined that if modified duty could be made available that
would prevent Plaintiff from having to do heavy lifting activities, then Plaintiff could return back
to his "usual customary work."  AR 87.

On September 12, 2001, Dr. Diaso completed a Progress Report form regarding
examination of Plaintiff.  AR 137.  Plaintiff complained of frequent, slight, right hip pain,
described as a dull ache.  AR 137.  Dr. Diaso diagnosed lumbar disc syndrome and disc
degeneration, and he instructed Plaintiff to remain off-work until October 15, 2001.  AR 137.

On November 2, 2001, Dr. Diaso completed a Progress Report form regarding
examination of Plaintiff .  AR 136.  Dr. Diaso reported that after Plaintiff cut wood for two
hours, he experienced a flare of lumbar pain.  AR 136.  Dr. Diaso diagnosed Plaintiff with
lumbar disc "lesion" and lumbar disc "Deg."  AR 136.  His treatment plan included
manipulation, traction, EMS and heat 3x a week until pre-flare.  AR 136.

On December 12, 2001, Dr. Diaso completed information for the State Compensation
Insurance Fund regarding Plaintiff's ability to return to regular or modified work.  AR 135.  Dr.
Diaso indicated that Plaintiff had been discharged, but he had permanent restrictions from heavy
lifting and repetitive bending and stooping.  AR 135.  Dr. Diaso also indicated that Plaintiff
would need chiropractic care for periodic flares and prototherapy to stabilize joints.  AR 135.

On December 13, 2001, Dr. Diaso completed a Report of Employee's Present Work
Status for the State Compensation Insurance Fund.  AR 130.  Dr. Diaso remarked that Plaintiff
was a candidate for vocational rehab and was able to participate in re-training.  AR 130.

On December 24, 2001, Dr. Diaso prepared a Primary Treating Physician's Permanent
and Stationary Report form.  AR 129, 131-134.  Dr. Diaso diagnosed Plaintiff with lumbar
sprain/strain, cervical capsulitis, lumbar disc bulge and myofascitis.  AR 132.  Dr. Diaso opined

that Plaintiff could not return to his usual occupation, but could perform another line of work. AR 132. Dr. Diaso also opined that Plaintiff had frequent low back pain of slight to moderate severity and occasional to intermittent cervical spine pain with greater than minimal severity. AR 133. Dr. Diaso indicated that Plaintiff could not cut firewood or shovel without pain. AR 133. Plaintiff was precluded from heavy lifting and restricted from repetitive bending and stooping. AR 134.

On February 11, 2002, Dr. Diaso prepared a Progress Report from regarding examination of Plaintiff on February 4, 2002. AR 125-126. Dr. Diaso described Plaintiff's subjective complaints to include frequent (51 to 75% of awake time) lower lumbar region right pain with radiation into the groin and intermittent (26 to 50% of awake time) mid cervical region right dull pain increased by quick cervical movements. AR 125. Plaintiff rated the lower lumbar pain to be 4/10 and the mid cervical pain to be 3/10. AR 125. Dr. Diaso diagnosed Plaintiff with sprain/strain, cervical capsulitis and lumbar disc bulge. AR 125. Plaintiff's treatment plan included manual traction and diversified adjustment of L4, L5, C4 and C5. AR 125.

On May 10, 2002, Dr. Diaso completed a Progress Report form regarding examination of Plaintiff. AR 124. Dr. Diaso indicated that Plaintiff tried working on "heavy machinery, weed eater." AR 124. He had right leg pain and right buttock pain "[f]requent greater than moderate." AR 124. Dr. Diaso diagnosed Plaintiff with lumbar disc and lumbar facet pain. AR 124. Plaintiff's treatment plan included manipulation, EMS, traction and heat 3x a week for two weeks. AR 124. Dr. Diaso instructed Plaintiff to remain off-work until June 25, 2002. AR 124.

On June 17, 2002, PA Brown and orthopedist Daniel B. Brubaker, D.O., prepared a Permanent and Stationary Report regarding a follow-up visit with Plaintiff. AR 195-197. PA Brown/Dr. Brubaker reported that Plaintiff had not participated in any vocational rehabilitation or job placement. AR 195. Plaintiff reportedly lived in a tent and had no transportation. AR 195. PA Brown/Dr. Brubaker believed that Plaintiff was "capable of performing at least some modified duties and...would like to see him return back to some type of employment so that he can get back on to his life." AR 195-196. PA Brown/Dr. Brubaker further reported that Plaintiff's low back pain was localized in the lumbosacral spine and he did not have any pain that

radiated into the groin or leg. AR 196. Plaintiff was having significant difficulties with his knee as a result of falling from a back spasm. AR 196. Plaintiff's lower back pain was on average 3/10 on a regular basis. AR 196. He was unable to tolerate increased physical activities and he could not stand for very long without experiencing increasing back pain. AR 196. Codeine had "worked very well" to resolve Plaintiff's pain flares and he was prescribed Tylenol with Codeine. AR 196.

On June 18, 2002, PA Brown and Dr. Brubaker saw Plaintiff and completed a Progress Report. AR 193. Plaintiff complained of continued chronic low back pain. AR 193. PA Brown and Dr. Brubaker diagnosed Plaintiff with chronic LS sprain. AR 193. Plaintiff reported doing well with Codeine. AR 193.

On June 21, 2002, Dr. Diaso completed a Progress Report form. AR 122-123. Dr. Diaso described Plaintiff's complaints as frequent, slight lower back pain, which could become greater than moderate with heavy work. AR 122. Dr. Diaso diagnosed Plaintiff with lumbar disc pain and lumbar facet pain. AR 122. Plaintiff's treatment plan included manipulation, traction, EMS and heat once every two weeks or as needed. AR 122. Dr. Diaso indicated that Plaintiff should start vocational rehab and be referred to Dr. Singh/Dr. Brown for injection of facet and disc under fluroscopy. AR 122.

On June 23, 2002, Dr. Diaso prepared a Supplemental Report regarding examination of Plaintiff on June 21, 2002. AR 120-121. Dr. Diaso described Plaintiff's pain as "frequent light low back pan [sic], which can become greater than moderate with heavy work." AR 120. On examination, Plaintiff had lumbar pain with extension, flexion and right lateral flexion. AR 120. Bechterew's sign was positive on the right for reproduction of low back pain. AR 120. Palpation revealed tenderness at the L3, L4, L5 spinous process with lumbar paraspinous musculature. AR 120. Dr. Diaso diagnosed Plaintiff with lumbar internal disc derangement with pain and lumbar facet pain. AR 120. Plaintiff's treatment plan consisted of spinal manipulation, traction, deep tissue massage and electrical stimulation. AR 121. Dr. Diaso commented that Plaintiff should begin vocational rehabilitation and was a candidate for work rehabilitation. AR 121.

On October 4, 2002, Dr. Diaso completed a Progress Report form.  AR 119.  Dr. Diaso indicated that Plaintiff had done well for 8 weeks, but experienced intermittent, minimal to slight, lower back pain.  AR 119.  Dr. Diaso diagnosed lumbar disc pain and lumbar facet syndrome.  AR 119.  Plaintiff's treatment plan included manipulation and traction.  AR 119.

On November 6, 2002, Dr. Diaso completed a Progress Report form.  AR 118.  Dr. Diaso described Plaintiff's subjective complaints as right leg to knee cramping made worse by prolonged walking.  AR 118.  Dr. Diaso diagnosed lumbar disc pain and lumbar facet pain.  AR 118.  Plaintiff's treatment plan included manipulation, traction, EMS, heat, referral to a doctor and a cane to assist with walking.  AR 118.

On November 15, 2002, Dr. Brubaker completed a Consultation Report for the State Compensation Insurance Fund.  AR 189-191.  On physical examination, Plaintiff's range of motion was decreased by 50% of normal in all directions.  AR 190.  His straight leg test was positive on the right and radiated down his right leg.  AR 190.  His low back pain was localized to his lumbosacral spine.  AR 190.  On palpation of his low back, Plaintiff had muscle spasm.  AR 190.  On medications, Plaintiff reported his pain averaged about 3/10 and, without medications, it increased to about 8/10.  AR 190.  Dr. Brubaker diagnosed Plaintiff with "probably L4-L5 and L5-S1 discs annular tears."  AR 190.  Dr. Brubaker noted that he had no x-rays or MRIs available to him.  AR 190.  Plaintiff's treatment plan included Norco and Soma.  AR 190.

On February 13, 2003, Dr. Diaso completed a Progress Report form.  AR 117.  Dr. Diaso described Plaintiff's subjective complaints as lower back pain, which traveled down the right leg into the foot, with a range of 4-8/10 for pain.  AR 117.  Dr. Diaso diagnosed Plaintiff with lumbar disc derangement and lumbar disc degeneration.  AR 117.  Plaintiff's treatment plan included manipulation, EMS, heat and massage.  AR 117.  Dr. Diaso opined that Plaintiff had been instructed to return to modified work.  AR 117.

On February 13, 2003, Dr. Brubaker prepared a Progress Report form.  AR 188.  Plaintiff complained of low back pain and reported good results with meds.  AR 188.  Dr. Brubaker

diagnosed Plaintiff with chronic low back pain and lumbar disc.  AR 188.  He opined that

Plaintiff's work status was "temporary totally disabled."  AR 188.

On February 15, 2003, Daniel Anrig, D.O., Q.M.E., completed a State Qualified Medical

Evaluation of Plaintiff for the State Compensation Insurance Fund.  AR 101-116.  Dr. Anrig saw

Plaintiff on January 28, 2003.  AR 101.  Dr. Anrig reviewed Plaintiff's medical records and the

history of his injury and treatment.  AR 101-104.  On physical examination, Plaintiff appeared to

be in acute discomfort, moving with a guarded posture and changing positions on several

occasions.  AR 108.  He walked on his heels and toes with pain.  AR 108.  He was unable to

squat to the floor without pain.  AR 108.  He ambulated with an altered gait.  AR 108.  On static

digital palpation, Plaintiff had mild to moderate hypertonicity muscles in the lumbar spine with

spasms and swelling.  AR 108.  He had back pain on leg raise and positive Kemp's, Ely's and

Trendelenburg's tests.  AR 108.  Plaintiff described pain on performing all ranges of motion.  AR

108.  Dr. Anrig diagnosed Plaintiff with lumbar disc syndrome and lumbosacral radiculitis and

opined that Plaintiff's condition had reached a permanent and stationary status and that Plaintiff

had sustained "a permanent partial disability."  AR 109-110.  Plaintiff had "constant moderate"

lower back pain radiating down the right leg.  AR 110.  Dr. Anrig further opined that Plaintiff

had a disability precluding him from heavy work and had lost approximately fifty percent of his

pre-injury capacity for bending, stooping, lifting, pushing, pulling, climbing or other activities

involving comparable physical effort.  AR 111.

On April 25, 2003, the State Division of Workers' Compensation issued a summary

rating determination.  AR 72-73.  Plaintiff was given a "permanent disability" rating

determination due to slight limitation of motion of lumbar spine, constant moderate low back

pain radiating into the right leg and a preclusion from heavy work.  AR 73.  Disability Evaluator

Raul Hernandez indicated that the permanent disability rating was 56% of total disability and

equivalent to a total sum of $47,137.50.  AR 72.

On May 8, 2003, Dr. Diaso completed a Supplemental Report for the California

Department of Social Services.  AR 115-116.  Dr. Diaso described Plaintiff's symptoms as

"frequent in stable low back pain, which is aggravated by heavy work activities."  AR 115.  Dr.

Diaso opined that Plaintiff was "temporarily partial disabled." AR 115. Plaintiff had lumbar spine pain on flexion, extension, right lateral flexion, left lateral flexion and right rotation. AR 116. Dr. Diaso diagnosed Plaintiff with lumbar disc derangement, lumbar disc degeneration and unstable lumbar spine. AR 116. Dr. Diaso indicated that Plaintiff had suffered permanent injuries to his lumbar spine, which affected his ability to perform heavy activities and repetitive bending or twisting at the trunk. AR 116. He also had pain with prolonged sitting and walking. AR 116.

On May 16, 2003, Plaintiff saw Dr. Brubaker for complaints of lumbar pain. AR 187. Dr. Brubaker prepared a Progress Report regarding the examination. AR 187. Dr. Brubaker diagnosed Plaintiff with lumbar discs and right radiculopathy. AR 187. He opined that Plaintiff was permanent and stationary. AR 187.

On June 10, 2003, Troy Smith, M.D., a board certified orthopedic surgeon, completed an orthopedic consultation evaluation of Plaintiff. AR 156-160. Plaintiff complained to Dr. Smith of back pain. AR 156. On orthopedic examination, Plaintiff was in obvious discomfort from his back and was wearing a back brace. AR 157. He walked with a definite limp on the right because of pain. AR 57. He walked with a cane. AR 157. Plaintiff's cervical spine range of motion was within normal limits. AR 157. Plaintiff's lumbar spine range of motion was below normal limits. AR 157. Dr. Smith's impression was low back pain with right radiculitis, degenerative lumbar disk disease and right shoulder pain and muscle spasm. AR 159. Dr. Smith opined that Plaintiff was unable to do work "which requires repeated bending or heavy lifting." AR 160. He could lift and carry 40 pounds occasionally and 20 pounds frequently. AR 160. He could lift 20 pounds maximum with the right hand. AR 160. He could sit one hour out of an eight-hour work day. AR 160. He could stand and walk a mile with a cane with intermittent resting periods. AR 160. He could not kneel, squat or climb stairs except on an infrequent basis. AR 160. He occasionally could do work below the shoulder level and above the shoulder level on the right. AR 160. He could not work with his right hand overhead. AR 160.

1    On June 25, 2003, James B. Peery, M.D., completed a Psychiatric Review Technique

2 form.  AR 164-177.  Dr. Peery opined that Plaintiff did not have a medically determinable

3 impairment.  AR 164.  On June 26, 2003, Glenn Ikawa, M.D., also signed the form.  AR 164.

4    On June 25, 2003, Dr. Peery also completed a Physical Residual Functional Capacity

5 form.  AR 178-185.  Dr. Peery opined that Plaintiff could lift and/or carry 20 pounds

6 occasionally, 10 pounds frequently, could stand and/or walk about 6 hours in an 8-hour workday,

7 could sit about 6 hours in an 8-hour workday and could push and/or pull without limitation other

8 than as shown for lift and/or carry.  AR 179.  He occasionally could climb, stoop, kneel, crouch

9 and crawl and frequently could balance.  AR 180.  He had no manipulative, visual,

10 communicative or environmental limitations.  AR 181-182.  On September 20, 2003, Durell

11 Sharbaugh, M.D., reviewed and affirmed Dr. Peery's assessment.  AR 185.

12    On August 28, 2003, Dr. Diaso completed a Progress Report regarding examination of

13 Plaintiff.  AR 209.  Plaintiff complained of low back pain and trouble sleeping due to the pain.

14 AR 209.  Dr. Diaso diagnosed Plaintiff with lumbar disc derangement, lumbar disc degeneration

15 and lumbar region dysfunction.  AR 209.  Dr. Diaso indicated Plaintiff's work status was

16 "T.T.D."  AR 209.

17    On October 21, 2003, Dr. Diaso corrected his Progress Report dated August 28, 2003.

18 AR 208.  Dr. Diaso indicated that he had marked temporary total disability, but meant that

19 Plaintiff continued to be permanent and stationary.  AR 208.

20    On November 11, 2003, Dr. Diaso completed a Supplemental Report regarding

21 examination of Plaintiff.  AR 205-206.  Plaintiff indicated that he had "suffered an insidious

22 flare" and was experiencing right side low back pain with numbness traveling into his right foot.

23 AR 205.  Plaintiff rated his pain as a 4 to 7 out of 10.  AR 205.  Dr. Diaso reported that on

24 Plaintiff's pain drawing, Plaintiff wrote down sharp and cramping pain, which extended from the

25 right sacroiliac region into the posterior knee.  AR 205, 207.  On examination, Plaintiff's lumbar

26 range of motion was within normal limits.  AR 205.  He had pain on lateral bending.  AR 205.

27 Digital palpation reveled tenderness over the L4, L5 spinous processes and along the right iliac

28

1   crest.  AR 205.  Plaintiff's treatment plan included chiropractic manipulative therapy combined

2   with electrical stimulation and moist heat twice a week.  AR 205.

3       On May 6, 2004, Dr. Diaso completed a Progress Report form.  AR 204.  Plaintiff

4   complained of low back pain, which traveled into the right groin and leg.  AR 204.  Plaintiff had

5   a flare after bending at the waist to pick up a dog dish.  AR 204.  Dr. Diaso diagnosed lumbar

6   disc derangement and "lumbar Disc Deg."  AR 204.  Plaintiff's treatment plan included

7   manipulation of the lumbar and thoracic spine for pain reduction and for increase in function,

8   along with EMS and heat.  AR 204.  Plaintiff's work status was "T.T.D."  AR 204.

9       On September 23, 2004, Dr. Diaso opined that Plaintiff was unable to sit due to a

10   permanent back injury.  AR 201.  On that same date, Dr. Diaso completed a General Relief form.

11   AR 202-203.  Dr. Diaso opined that Plaintiff had a physical or mental incapacity that prevented

12   or substantially reduced his ability to engage in work, training and/or provide the necessary care

13   for his children.  AR 202.  Dr. Diaso again opined that Plaintiff was not able to sit due to a low

14   back injury.  AR 202.  Dr. Diaso further opined that Plaintiff was not able to work.  AR 202.

15   Plaintiff was diagnosed with a lumbar spine injury, disc herniation and sciatica.  AR 203.

16       ALJ's Findings

17       The ALJ found that Plaintiff met the requirements for Disability Insurance Benefits and

18   was insured for benefits through the date of the decision.  AR 19.  The ALJ also found that

19   Plaintiff had not engaged in substantial gainful activity since the alleged onset of disability.  AR

20   19.  The ALJ determined that Plaintiff's degenerative disc disease was a "severe" impairment.

21   AR 19.  He also had a non-severe impairment of right shoulder pain.  AR 19.  The ALJ

22   concluded that Plaintiff's medically determinable impairment did not meet or medically equal

23   one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.  AR 19.  The ALJ

24   further found that Plaintiff's allegations regarding his limitations were not totally credible.  AR

25   16-17, 19.  He retained the residual functional capacity ("RFC") to lift and carry 20 pounds

26   occasionally and 10 pounds frequently.  AR 19.  He could stand, walk or sit six hours each in an

27   eight-hour day and was limited to occasional climbing, stooping, kneeling, crouching and

28   crawling.  AR 19.  The ALJ concluded that Plaintiff was unable to perform his past relevant

1   medium to very heavy work, but could perform a significant range of light work.  AR 19-20.

2   Although the ALJ decided that Plaintiff could not perform the full range of light work, the ALJ

3   used Medical-Vocational Rule 202.18 as a framework and determined that Plaintiff was not

4   disabled.  AR 20.

5   **SCOPE OF REVIEW**

6         Congress has provided a limited scope of judicial review of the Commissioner's decision

7   to deny benefits under the Act.  In reviewing findings of fact with respect to such determinations,

8   the Court must determine whether the decision of the Commissioner is supported by substantial

9   evidence.  42 U.S.C. § 405(g).  Substantial evidence means more than a mere scintilla,

10  *Richardson v. Perales*, 402 U.S. 389, 401 (1971), but less than a preponderance.  *Sorenson v.*

11  *Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975).  It is "such relevant evidence as a

12  reasonable mind might accept as adequate to support a conclusion."  *Richardson*, 402 U.S. at 401

13  (internal quotation marks and citation omitted).  The record as a whole must be considered,

14  weighing both the evidence that supports and the evidence that detracts from the Commissioner's

15  conclusion.  *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).  In weighing the evidence and

16  making findings, the Commissioner must apply the proper legal standards.  *E.g.*, *Burkhart v.*

17  *Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).  This Court must uphold the Commissioner's

18  determination that the claimant is not disabled if the Commissioner applied the correct legal

19  standards and if the Commissioner's findings are supported by substantial evidence.  *See Sanchez*

20  *v. Sec'y of Health and Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

21  **REVIEW**

22        In order to qualify for benefits, a claimant must establish that he is unable to engage in

23  substantial gainful activity due to a medically determinable physical or mental impairment that

24  has lasted or can be expected to last for a continuous period of not less than 12 months.  42

25  U.S.C. § 1382c (a)(3)(A).  A claimant must show that he has a physical or mental impairment of

26  such severity that he is not only unable to do his previous work, but cannot, considering his age,

27  education, and work experience, engage in any other kind of substantial gainful work that exists

28  in the national economy.  *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989).  The

1   burden is on the claimant to establish disability. *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir.

2   1990).

3   In an effort to achieve uniformity of decisions, the Commissioner has promulgated

4   regulations which contain, inter alia, a five-step sequential disability evaluation process. 20

5   C.F.R. § § 404.1520(a)-(g), 416.920 (a)-(g) (2004).  Applying the evaluation process in this case,

6   the ALJ found that Plaintiff (1) has not engaged in substantial gainful activity since the alleged

7   onset of disability; (2) has an impairment or a combination of impairments that is considered

8   "severe" (degenerative disc disease) based on the requirements in the Regulations (20 C.F.R. §§

9   404.1520(c) and 416.920(c) (2004)); (3) does not have an impairment or combination of

10  impairments that meets or equals one of the impairments set forth in Appendix 1 to Subpart P of

11  Part 404;  (4) is unable to perform his past relevant work; but (5) has the RFC to perform a

12  significant range of light work in the national economy.  AR 19-20.

13  Here, Plaintiff argues that (1) the ALJ incorrectly rejected the opinions of Plaintiff's

14  treating or examining physicians; (2) the ALJ incorrectly found that Plaintiff's right shoulder

15  condition is "non-severe;" (3) the ALJ improperly rejected Plaintiff's allegations of pain; and (4)

16  the ALJ failed to provide the VE with a complete hypothetical.

17                                          **DISCUSSION**

18  A.      Opinions of Treating or Examining Physicians

19  Plaintiff alleges that the ALJ erred by relying on the opinion of a state agency non-

20  examining physician instead of the opinions of physicians who treated or who examined

21  Plaintiff.  Cases in this circuit distinguish among the opinions of three types of physicians: (1)

22  those who treat the claimant (treating physicians); (2) those who examine but do not treat the

23  claimant (examining physicians); and (3) those who neither examine nor treat the claimant (non-

24  examining physicians).  The opinions of treating physicians should be given more weight than

25  the opinions of physicians who do not treat the claimant. *Reddick v. Chater*, 157 F.3d 715, 725

26  (9th Cir.1998); *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir.1995).  Where the treating physician's

27  opinion is not contradicted by another physician, it may be rejected only for "clear and

28  convincing" reasons supported by substantial evidence in the record. *Lester*, 81 F.3d at 830.

1  Even if the treating physician's opinion is contradicted by another physician, the ALJ may not

2  reject this opinion without providing "specific and legitimate reasons" supported by substantial

3  evidence in the record. *Id.* (quoting *Murray v. Heckler*, 722 F.2d 499, 502 (9th Cir.1983)).  This

4  can be done by setting out a detailed and thorough summary of the facts and conflicting clinical

5  evidence, stating his interpretation thereof, and making findings. *Magallanes  v. Bowen*, 881

6  F.2d 747, 751 (9th Cir.1989).  The ALJ must do more than offer his conclusions.  He must set

7  forth his own interpretations and explain why they, rather than the physicians', are correct.

8  *Embrey v. Bowen*, 849 F.2d 418, 421-22 (9th Cir.1988).

9  _____  The opinion of an examining physician is, in turn, entitled to greater weight than the

10 opinion of a non-examining physician. *Pitzer v. Sullivan,* 908 F.2d 502, 506 n.4 (9th Cir.1990);

11 *Gallant v. Heckler,* 753 F.2d 1450 (9th Cir.1984).  As is the case with the opinion of a treating

12 physician, the ALJ must provide "clear and convincing" reasons for rejecting the uncontradicted

13 opinion of an examining physician. *Pitzer,* 908 F.2d at 506.  And like the opinion of a treating

14 physician, the opinion of an examining physician, even if contradicted by another physician, can

15 be rejected only for specific and legitimate reasons that are supported by substantial evidence in

16 the record. *Andrews v. Shalala,* 53 F.3d 1035, 1043 (9th Cir.1995).

17 _____In his opening brief, Plaintiff refers only to the opinion of an examining physician, the

18 "Board Certified Orthopedist," and fails to identify any other treating or examining physician

19 opinions to support his argument.  Plaintiff's Opening Brief For Summary Judgment And/Or

20 Remand ("Opening Brief"), p. 5.  In his Reply To Defendant's Opposition to Plaintiff's Opening

21 Brief ("Reply Brief"), Plaintiff directs the Court to the opinions of Dr. Troy Smith, a Board

22 Certified Orthopedic Surgeon, and Dr. John Diaso, a chiropractor.  These opinions were

23 referenced in the factual background of the Opening Brief.  Reply Brief, p 1-2.  Accordingly, the

24 Court now turns to the opinions of Drs. Smith and Diaso.

25       1.    Opinion of Dr. Troy Smith

26       In June 2003, Dr. Troy Smith, a board certified orthopedic surgeon, completed a

27 consultative examination of Plaintiff.  AR 156-160.  Following the examination, Dr. Smith

28 opined that Plaintiff was unable to do work "which requires repeated bending or heavy lifting,"

24

but could lift and carry 40 pounds occasionally, 20 pounds frequently, could sit one hour out of

an eight-hour work day and could stand and walk a mile with a cane with intermittent resting

periods.  AR 160.  Dr. Smith further opined that Plaintiff could not kneel, squat or climb stairs

except on an infrequent basis.  AR 160.  He occasionally could do work below the shoulder level

and above the shoulder, but only could lift 20 pounds maximum with the right hand.  AR 160.

     Here, the ALJ gave "little weight" to the sitting limitations imposed by Dr. Smith

because they appeared "to be based heavily on the claimant's subjective allegations, not objective

findings."  AR 17.  The ALJ also rejected Dr. Smith's opinion regarding Plaintiff's upper

extremity limitations, finding them "too restrictive in light of the claimant's testimony, wherein

he reported episodic right shoulder pain, lasting 10-15 minutes and occurring two to three times a

year."  AR 17.   In rejecting Dr. Smith's opinion, the ALJ accepted the limitations of the non-

examining state medical consultants.  AR 17.  However, the opinion of a non-examining

physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion

of either an examining physician *or* a treating physician. *Pitzer,* 908 F.2d at 506 n. 4; *Gallant,*

753 F.2d at 1456.  In *Gallant,* the Ninth Circuit held that "the report of [a] non-treating, non-

examining physician, combined with the ALJ's own observance of [the] claimant's demeanor at

the hearing" did not constitute "substantial evidence" and, therefore, did not support the

Commissioner's decision to reject the examining physician's opinion that the claimant was

disabled.  753 F.2d at 1456.  Similarly, in *Pitzer,* the Ninth Circuit concluded that the non-

examining doctor's opinion "with nothing more" did not constitute substantial evidence.  908

F.2d at 506 n. 4.  The ALJ's decision to accept the limitations imposed by the non-examining

state agency medical consultants and his own assessment of Plaintiff's limitations over the

opinion of Dr. Smith do not constitute substantial evidence.  Accordingly, remand is appropriate

to allow the ALJ to consider the proper weight to afford Dr. Smith's opinion.

     To the extent that Dr. Smith's opinion may be contradicted by the State Agency medical

consultants, the ALJ may not reject Dr. Smith's opinion without providing "specific and

legitimate reasons" supported by substantial evidence in the record.  If there is "substantial

evidence" in the record contradicting the opinion of the examining physician, the ALJ is

instructed to consider the factors listed in Sections 404.1527(d) and 416.927(d) in determining

what weight to accord the opinion of Dr. Smith on remand. 20 C.F.R. §§ 404.1527 and 416.927

(2004).

2. Opinion of Dr. Diaso

In challenging the ALJ's decision, Plaintiff contends that the ALJ improperly rejected the

opinion of "Plaintiff's treating physician, Dr. John Diaso." Opening Brief, p. 3; Reply Brief, p.1.

This contention is without merit. Dr. Diaso is a chiropractor and is not considered an "acceptable

medical source." 20 C.F.R. §§ 404.1513(a), 416.913(a). Instead, he is considered to be an "other

source" whose opinion the ALJ may give less weight than that of an acceptable medical source,

such as a treating physician. 20 C.F.R. §§ 404.1513(d), 416.913(d); Gomez v. Chater, 74 F.3d

967, 970-71 (9th Cir. 1996). Although there are exceptions to this rule, such as when a treating

physician adopts the opinion of an unacceptable medical source or when the unacceptable source

works closely with a physician, they are not applicable here. Polny v. Bowen, 864 F.2d 661, 662-

664 (9th Cir. 1988); Gomez,74 F.3d at 970-971.

B.    Severity of Impairment

Plaintiff contends that the ALJ erred by finding his right shoulder condition to be non-

severe. At the second step of the sequential evaluation of disability, the ALJ determines whether

a claimant has a severe impairment or combination of impairments. A severe impairment is one

that significantly limits the claimant's physical or mental ability to do basic work activities. 20

C.F.R. §§ 404.1520(c), 416.920(c). An impairment or combination of impairments is found "not

severe" and a finding of "not disabled" is made at this step when medical evidence establishes

only a slight abnormality or a combination of slight abnormalities which would have no more

than a minimal effect on an individual's ability to work. even if the individual's age, education,

or work experience were specifically considered (i.e., the person's impairment has no more than

a minimal effect on his or her physical or mental ability(ies) to perform basic work activities).

SSR 85-28. A determination that an individual's impairment is not severe "requires a careful

evaluation of the medical findings that describe the impairment(s) (i.e., the objective medical

evidence and any impairment-related symptoms), and an informed judgment about the limitations

1    and restrictions the impairment(s) and related symptom(s) impose on the individual's physical

2    and mental ability to do basic work activities."  SSR 96-3p.

3         Plaintiff fails to specify any medical evidence or impairment-related symptoms

4    supporting his contention of a severe right shoulder impairment.  Moreover, in determining that

5    Plaintiff's right shoulder limitation was not severe, the ALJ relied on Plaintiff's own testimony

6    that he experienced episodic right shoulder pain, which lasted 10-15 minutes and occurred two to

7    three times a year.  AR 17.  The ALJ also considered Plaintiff's lack of treatment for his right

8    shoulder complaint in making a determination that the pain was non-severe in nature.  AR 17.

9    C.    Allegations of Pain

10        Plaintiff argues that the ALJ improperly rejected his allegations of pain.  An ALJ is

11   required to make specific findings assessing the credibility of a claimant's subjective complaints.

12   *Ceguerra v. Sec'y of Health and Human Serv.*, 933 F.2d 735 (9th Cir. 1991).  In rejecting the

13   complainant's testimony, "the ALJ must identify what testimony is not credible and what

14   evidence undermines the claimant's complaints."  *Lester*, 81 F.3d at 834.  It is possible to suffer

15   disabling pain even where the degree of pain is unsupported by objective medical findings. *Fair*

16   *v. Bowen*, 885 F.2d 597, 601 (9th Cir. 1989).  "In order to disbelieve a claim of excess pain, an

17   ALJ must make specific findings justifying that decision." *Id.* at 602 (citing *Magallanes v.*

18   *Bowen*, 881 F.2d 747, 755 (9th Cir. 1989).  The findings must justify convincingly the ALJ's

19   rejection of the claimant's excess pain testimony. *Id*

20        An ALJ is not required to believe every allegation of disabling pain.  "This holds true

21   even where the claimant introduces medical evidence showing that he has an ailment reasonably

22   expected to produce some pain." *Id.* at 603.  However, to discredit a claimant's testimony when

23   a medical impairment has been established, the ALJ must provide "'specific, cogent reasons for

24   the disbelief.'" *Morgan v. Commissioner of Social Sec. Admin.*,169 F.3d 595, 599 (9th Cir. 1999)

25   (quoting *Lester*, 81 F.3d at 834).

26        Plaintiff challenges the ALJ's findings regarding his allegations of pain for a number of

27   reasons.  The Court now turns to Plaintiff's contentions.

28

1    First, Plaintiff objects to the ALJ's determination that Plaintiff is receiving only pain

2    medications and is not a candidate for surgery, is not receiving treatment at a pain center and has

3    not been given a TENS unit or bio feedback.  Opening Brief, p. 7.  Plaintiff's treatment is a

4    relevant inquiry and an ALJ may discredit a claimant's allegations of pain where the claimant

5    receives minimal and conservative treatment.  *Meanel v. Apfel*, 172 F.3d 1111, 1114 (9th Cir.

6    1999).

7    Next, Plaintiff objects to the ALJ's consideration of the intensity of his pain and his pain

8    management as reported to Dr. Brubaker.  Opening Brief, p. 8.  In assessing Plaintiff's

9    credibility, the ALJ relies on a joint report by PA Brown and Dr. Brubaker, which indicated that

10   Plaintiff's lower back pain was on average 3/10 on a regular basis and that he had responded very

11   well to codeine for flare-ups.  AR 17, 196.  An ALJ's finding that symptoms improved with

12   medication is a valid consideration in assessing a claimant's credibility.  *Morgan*, 169 F.3d at

13   599.

14   Plaintiff also challenges the ALJ's consideration that although the Plaintiff "experienced

15   a flare-up in September 2004, prior to this episode, the claimant had not been seen since

16   November 2003."  AR 17.  However, an ALJ is permitted to consider lack of medical treatment

17   in assessing credibility.  *Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005).

18   Plaintiff also objects to the ALJ's consideration of Dr. Brubaker's opinion that Plaintiff

19   was capable of at least some modified duties.  Specifically, Plaintiff argues that Dr. Brubaker's

20   "isolated assessment should not take priority over the subsequent opinions of the examining and

21   treating physicians."  Opening Brief, p. 8.  As Plaintiff contends elsewhere, it is appropriate to

22   consider the opinions of treating medical sources, such as Dr. Brubaker, when assessing a

23   claimant's capabilities.  20 C.F.R. §§ 404.1527, 414.927 (2004).  Moreover, Plaintiff does not

24   indicate which treating or examining physicians' opinions should be credited over Dr. Brubaker's

25   opinion.

26   Plaintiff further challenges the ALJ's credibility assessment regarding Plaintiff's ability to

27   sit.  In considering this issue, the ALJ discounted Dr. Diaso's September 2004 opinion that

28   Plaintiff was not able to sit, because Dr. Diaso's earlier records only precluded Plaintiff from

1 | heavy lifting and repetitive bending and stooping, Dr. Diaso had release Plaintiff to participate in

2 | vocational rehabilitation and training in December 2001, and there was no indication that

3 | Plaintiff's condition had worsened.  AR 17.  That Dr. Diaso's recent opinion differed from his

4 | earlier views of Plaintiff's capabilities, such as those issued in 2001, does not indicate that Dr.

5 | Diaso's current opinion is inconsistent with the record or unsupported.  At least one other

6 | physician, examining orthopedist Dr. Troy Smith opined that Plaintiff could sit for only one hour

7 | in an eight-hour workday.  AR 160.  For reasons already discussed, the ALJ improperly rejected

8 | the limitations imposed by Dr. Smith.

9 |      Plaintiff also challenges the ALJ's determination that Plaintiff's limitations in sitting

10 | were unsupported because Plaintiff testified he could drive.  However, Dr. Smith's limitation to

11 | one hour of sitting is not inconsistent with Plaintiff's testimony that he could drive.  The record

12 | does not indicate how long Plaintiff could drive and there is no indication that Plaintiff was

13 | precluded from driving for short periods of time.  Accordingly, it may be appropriate on remand

14 | for the ALJ to review Plaintiff's symptom allegations regarding his ability to sit.

15 | D.    RFC and VE Hypothetical

16 |      Plaintiff further contends that the ALJ erred by failing to give his shoulder condition its

17 | full weight in the RFC assessment.  Plaintiff correctly states that when a claimant suffers from

18 | multiple impairments, the Commissioner must consider their combined effect without regard to

19 | whether any such impairment, if considered separately, would be of sufficient medical severity,

20 | in determining whether the claimant is disabled.  *Gregory v. Bowen*, 844 F.2d 664, 666 (9th

21 | Cir.1988), *Sprague v. Bowen*, 812 F.2d 1226, 1231 (9th Cir. 1987).  However, Plaintiff provides

22 | no supporting evidence to demonstrate that the ALJ failed to consider the combined effect of

23 | Plaintiff's right shoulder pain.  As previously indicated, the ALJ considered Plaintiff's testimony

24 | regarding the frequency, severity and duration of his episodic right shoulder pain when

25 | considering his upper extremity limitations.  AR 17.

26 |      Plaintiff also contends that the ALJ failed to present any evidence regarding Plaintiff's

27 | right shoulder condition to the VE.  "Hypothetical questions posed to the vocational expert must

28 | set out all the limitations and restrictions of the particular claimant . . . ."  *Embrey v. Bowen*, 849

1   F.2d 418, 422 (9th Cir. 1988).  The testimony of a VE "is valuable only to the extent that it is

2   supported by medical evidence." *Sample v. Schweiker*, 694 F.2d 639, 644 (9th Cir. 1982).

3   Therefore, the VE's opinion about a claimant's residual functional capacity has no evidentiary

4   value if the assumptions in the hypothetical are not supported by the record.  *Embrey*, 849 F.2d at

5   422.   Here, the ALJ presented the VE with limitations on Plaintiff's functional ability to lift and

6   carry 20 pounds occasionally and 10 pounds frequently.  AR 17, 241.  Plaintiff fails to identify

7   any other limitations that should have been presented to the VE related to Plaintiff's episodic

8   shoulder condition.  However, for the reasons discussed above, the ALJ improperly discredited

9   the limitations of Plaintiff's examining physician, including those related to his right shoulder.

10  Accordingly, once the ALJ makes a determination of the weight to afford the limitations

11  expressed by Dr. Smith, it may be appropriate to adopt a different  hypothetical than that adopted

12  by the ALJ here.

13                                              **RECOMMENDATION**

14          Based on the foregoing, the Court finds that the ALJ's decision is not supported by

15  substantial evidence in the record as a whole and is not based on proper legal standards.

16  Accordingly, the Court RECOMMENDS that Plaintiff's appeal from the administrative decision

17  of the Commissioner of Social Security be GRANTED and that JUDGMENT be entered for

18  Plaintiff Timothy W. Moore and against Defendant Michael J. Astrue.  The Court further

19  recommends that the action be REMANDED for proceedings consistent with this opinion.  These

20  findings and recommendations will be submitted to the Honorable Anthony W. Ishii, pursuant to

21  the provisions of Title 28 U.S.C. § 636(b)(l).  Within fifteen (15) days after being served with

22  these findings and recommendations, the parties may file written objections with the court.  The

23  document should be captioned "Objections to Magistrate Judge's Findings and

24  Recommendations."  The parties are advised that failure to file objections within the specified

25  time may waive the right to appeal the District Court's order.  *Martinez v. Ylst*, 951 F.2d 1153

26  (9th Cir. 1991).

27  IT IS SO ORDERED.

28  **Dated:     October 1, 2007                              /s/ John M. Dixon**
                                                    UNITED STATES MAGISTRATE JUDGE